Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

# UNITED STATES DISTRICT COURT

2018 JUN -8 PM 4: 11

### for the

United States District of Maryland CLERK'S OFFICE
AT BALTIMORE

Civil Division    BY_____DEPUTY

Case No.    **TDC 18 CV 1688**

)
)                *(to be filled in by the Clerk's Office)*
)
John W. Liccione                                    )
)
*Plaintiff(s)*                                      )
*(Write the full name of each plaintiff who is filing this complaint.*   )   Jury Trial: *(check one)*   ☒ Yes   ☐ No
*If the names of all the plaintiffs cannot fit in the space above,*       )
*please write "see attached" in the space and attach an additional*      )
*page with the full list of names.)*                )
-v-                                                 )
)
)
Anne Arundel Medical Center,                        )
Howard County General Hospital, et al               )
(see full list of defendants attached)              )
)
*Defendant(s)*                                      )
*(Write the full name of each defendant who is being sued.  If the*      )
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

## COMPLAINT FOR A CIVIL CASE

### I.    The Parties to This Complaint

#### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | John W Liccione |
| Street Address | 5824 Harness Court |
| City and County | Columbia,  Howard County |
| State and Zip Code | Maryland  21044 |
| Telephone Number | 240-917-6116 |
| E-mail Address | jliccione@gmail.com |

## B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Anne Arundel Medical Center |
| Job or Title *(if known)* | N/A |
| Street Address | 2001 Medical Parkway |
| City and County | Annapolis |
| State and Zip Code | MD   21041 |
| Telephone Number | 443-481-1000 |
| E-mail Address *(if known)* | unknown |

Defendant No. 2

| | |
|---|---|
| Name | Howard County General Hospital |
| Job or Title *(if known)* | N/A |
| Street Address | 5755 Cedar Lane |
| City and County | Columbia,  Howard County |
| State and Zip Code | MD  21044 |
| Telephone Number | 410-740-7890 |
| E-mail Address *(if known)* | unknown |

Defendant No. 3

| | |
|---|---|
| Name | See continuation sheet |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | See continuation sheet |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

E-mail Address *(if known)* _____

## II.     Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question                    ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.     If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

Denial of Medical Treatment on the Basis of Sex and Mental Disability in Violation of The 4th and 14th Ammendment guarantees of due process and equal potection under the law,  the Americans With Disabilities Act and the Civil Rights Act; Violation of Vulnerable Patient's HIPPA Privacy Rights. Denial of Patient's 1st Amendment rights to free speech, freedom of the press, and to petition the government for a redress of greivances.  Seizure of his person and property in inviolation of his 4th, 5th and 14th Amendment rights.  Denied his 6th amendment right to a speedy trial.  Fraud, Medical Malpractice.

### B.     If the Basis for Jurisdiction Is Diversity of Citizenship

1.     The Plaintiff(s)

a.     If the plaintiff is an individual

The plaintiff, *(name)*   John W Liccione                          , is a citizen of the State of *(name)*   Maryland                          .

b.     If the plaintiff is a corporation

The plaintiff, *(name)* _____ , is incorporated under the laws of the State of *(name)* _____ ,

and has its principal place of business in the State of *(name)* _____ .

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.   The Defendant(s)

    a.   If the defendant is an individual

        The defendant, *(name)*   See attached list of individual defendants   , is a citizen of

        the State of *(name)*   Maryland   . Or is a citizen of

        *(foreign nation)*   .

    b.   If the defendant is a corporation

        The defendant, *(name)*   Anne Arundel Medical Center, et al   , is incorporated under

        the laws of the State of *(name)*   MD   , and has its

        principal place of business in the State of *(name)*   MD   .

        Or is incorporated under the laws of *(foreign nation)*   MD   ,

        and has its principal place of business in *(name)*   Annapolis and Columbia, MD   .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.   The Amount in Controversy

    The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

    The large financial and other damages suffered (lost wages, lost stock, lost home, lost retirement, are well over $10,000,000

## III.   Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

COUNT I:  DENIAL OF MEDICAL TREATMENT ON THE BASIS OF SEX AND MENTAL DISABILITY
Defendents denied Plaintiff medical treatment because he was a man that was accusing his wife of assault and
attempted murder with poison, and because he had a history of depression.  They refused to run any specific
tests for poisons such as thallium and then ejected him from their hospitals without treating his ailments.  They
involuntarily committed him to a psychiatric hospital for 12 days under false pretenses.
COUNT 2: RECKLESS ENDANGERMENT.  Defendant 1 ejected Plaintiff from their facility while he was
suffering the effects of thallium poison and could barely walk.  Defendant's 1 & 2 also failed to report Plaintiff's
wife's homicide attempts to the police for investigation, nor did they preserve blood and urine samples.
Defendants revealed to his wife of his wherabouts and condition at a time she was poisoning him.
COUNT 3:  CRIMINAL NEGLIGENCE:  Defendant's failed to exercise a duty of care to Plaintiff that would
have been routinely provided to any patient in a similar situation, because of their gender bigotry regarding men
in a domestic violence situation, and because of their prejudice against those suffering from depression.
COUNT 4:  DEPRAVED INDIFFERENCE:  Defendants were indifferent to Plaintiff's pain, suffering, and fear
and kicked him out of their hospital without crutches or a wheelchair and left him in a poisoned state.
COUNT 5:  ILLEGAL INCARCERATION:  Defendants falsifield Plaintiff's involuntary commitment form by
claiming he wouldn't sign a voluntary committal form when he had agreed to do so but he just needed glasses to
read it.  They also represented falsely that he had expressed hostile intentions to others when he did not.
COUNT 6:  VOLATION OF HIPPA PRIVACY RIGHTS.  Defendant's revealed to Plaintiff's wife his location
and condition over his vehement objections and direct instructions not to do so to Defendants' staff.
COUNT 7:  MEDICAL MALPRACTICE:  Defendants' failed to test Plaintiff for thallium poison (which is
undetectable on a standard tox screen) even when they could see his thallium poison symptoms and they knew
that Plaintiff's wife had duped him into applying it to his foot which had a red scaly rash and his foot was in
severe pain - common symptoms of thallium poisoning.  They failed to diagnose and treat his foot and other
symptoms.
COUNT 8: FRAUD.  Defendant's falsified the involuntary commitment forms as well as fraudulently
represented that Plaintiff wouldn't sign a voluntary commitment form when he had agreed to do so.

## IV.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal
arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include
the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any
punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or
punitive money damages.

$10,000,000 in General Damages for Pain and Suffering, Emotional Distress, Reckless Endangerment, Criminal
Negligence, Depraved Indifference, Illegal Incarceration, Violation of HIPPA Privacy Rights, Fraud.

$8,403,336 in Special Damages for lost past and future wages, loss of home, loss of IRA funds and taxes on
early withdrawal, loss of future IRA gains, loss of 401K matching contributions, loss of stock holdings (177,500
shares) and expenses incurred for forced exercise and sale of his stock options before he lost them after being
fired due to Defendants' wrongful acts.  Payment of extra income taxes due to early exercise and forced sale of
stock options.

$25,000,000 in Punitive Damages for knowingly and willfully denying Plaintiff proper medical treatment and
the basis of his sex and mental health history, refusing to test him for thallium poison, failing to diagnose and
treat his physical symptoms (pain in left foot and scaly red rash), failing to provide crutches or wheelchair,
failing to notify the police Plaintiff's attempted murder and assault at his wife's hands, forcibly ejecting Plaintiff
from Defendant 1's hospital, falsifying involuntarily committal documents and involuntarily incarcerating him
for 12 days, violating his HIPPA privacy rights by disclosing to his wife who was actively trying to murder him,
his whereabouts and condition.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## V.     Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.     For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:            06/03/2018

Signature of Plaintiff        _John W Liccione_

Printed Name of Plaintiff    John W Liccione  Pro Se

### B.     For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

## IN THE UNITED STATES DISTRICT COURT OF THE DISTRICT OF MARYLAND

**JOHN LICCIONE**                                        *
5824 Harness Court                                       *
Columbia, MD 21044                                       *
240-917-6116                                             *
                                                         *
**Plaintiff**                                            *
                                                         *
**v.**                                                   *
                                                         *
**ANNE ARUNDEL MEDICAL CENTER**                          *
2001 Medical Pkwy, Annapolis, MD 21401                   *
Phone: 443-481-1000                                      *
**Defendant 1**                                          *
                                                         *
**HOWARD COUNTY GENERAL HOSPITAL**   *
5755 Cedar Lane, Columbia, MD 21044                      *
Phone:  410-740-7890*                                    *
**Defendant 2**                                          *     **CASE NO.:**
                                                         *
**DR. MARIA VILLANUEVA, MD**                             *
Johns Hopkins Community Physicians                       *     **JURY TRIAL DEMANDED**
8600 Old Georgetown Rd                                   *
4th Floor, D Wing, Hospitalist Office                    *
Bethesda, MD 20814 map                                   *
Phone: 301-896-7500                                      *
**Defendant 3**                                          *
                                                         *
**DR. VLADIMIR DEMIDOV, MD**                             *
2001 Medical Pkwy, Annapolis, MD 21401                   *
Phone:  (443) 481-3767                                   *
**Defendant 4**                                          *
                                                         *
**DR. DANIEL PALUCHOWSKI, MD**                           *
2001 Medical Pkwy, Annapolis, MD 21401                   *
Phone: 443-481-1000                                      *
**Defendant 5**                                          *
                                                         *
**DR. C. MICHAEL REMOLL, MD**                            *
2001 Medical Pkwy, Annapolis, MD 21401                   *
Phone: (443) 481-1000                                    *
**Defendant 6**                                          *
                                                         *

**DR. COLLEEN GIBSON, MD**                   *
2001 Medical Pkwy, Annapolis, MD 21401       *
Phone: (410) 481-1366                        *
**Defendant 7**                              *
                                             *
**KIMBERLY SCHAUBER, RN**                    *
1902 Campus Commons Dr, Suite 650
Reston, VA, 20191                            *
Phone: 703-390-2300                          *
**Defendant 8**                              *
                                             *
**MICHAEL R MIDGLEY, LCSW-C**                *
5058 Dorsey Hall Drive                       *
Suite 103                                    *
Ellicott City, Maryland 21042                *
Phone:  240-334-6940                         *
**Defendant 9**                              *
                                             *
**DR. ANGELINO, MD**                         *
5755 Cedar Ln, Columbia, MD 21044            *
Phone:  410-720-8149                         *
**Defendant 10**                             *
                                             *
**DR. WILLIE W BIVINGS, JR, MD**             *
5755 Cedar Ln, Columbia, MD 21044            *
Phone:  410-550-9720                         *
**Defendant 11**                             *
                                             *
**DR. RAY K CHAWLA, MD**                     *
14300 Gallant Fox Lane, Bowie, MD  20715     *
301-809-5556                                 *
**Defendant 12**                             *
                                             *
**HARRY GILL, MD**                           *
4701 Willard AVE #818 Chevy Chase, MD 20815  *
Phone: 202-248-1537                          *
**Defendant 13**                             *
*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

## COMPLAINT

Plaintiff hereby sues Defendants.  The causes of action are: Denial of Medical Treatment

on the Basis of Sex and Mental Disability in Violation of the Americans With Disabilities and

---

Civil Rights Acts, Violation of the Fifth Amendment Right to be free from denial of liberty and property without due process of law, the Fourteenth Amendment Right to Due Process and Equal Protection Under the Law, Violation of Patient HIPPA Privacy Rights, Reckless Endangerment, Gross Negligence, Depraved Indifference, Illegal Incarceration, Medical Malpractice, and Fraud.


## THE PARTIES

**John Liccione (Plaintiff)** is a 58 year-old male Maryland resident and was a patient of Defendant 1 twice in October of 2013, twice in May and July of 2016, and once in August of 2016.

**Anne Arundel Medical Center (Defendant 1)** is a hospital in Annapolis, Maryland, that treated Plaintiff in October of 2013 and again in August of 2016.

**Howard County General Hospital (Defendant 2)** is a hospital in Columbia, Maryland, that treated Plaintiff in October of 2013, May of 2016, and July and August of 2016.

**Dr. Maria Villanueva (Defendant 3)** was a employee working at Defendant 1 who examined Plaintiff in October of 2013.

**Dr. Vladimir Demidov (Defendant 4)** was a psychiatrist working at Defendant 1 who examined Plaintiff in October of 2013.

**Dr. Daniel Paluchowski (Defendant 5)** was an employee of Defendant 1 who examined Paintiff in October 2013.

**Dr. C. Michael Remoll (Defendant 6)** was an employee of Defendant 1 who examined Plaintiff in October of 2013.

**Dr. Colleen Gibson (Defendant 7)** is a psychiatrist working at Defendant 1 who examined Plaintiff in October 2013.

**Kimberly Schauber, RN (Defendant 8)** was a nurse at Defendant 1 and is believed to have been the charge nurse in the observation ward Plaintiff stayed overnight in on October 5 of 2013.

**Michael R. Midgley, LCSW-D (Defendant 9)** was an employee of Defendant 2 and who had committed Plaintiff twice to mental institutions in July and August of 2016.

**Dr. Angelino, MD (Defendant 10)** was an employee of Defendant 2 and who had examined Plaintiff.

**Dr. Willie W. Bivings, JR, MD (Defendant 11)** was an employee of Defendant 2 who examined Plaintiff.

**Dr. Ray K Chawla (Defendant 12)** was an employee of Defendant 2 who examined Plaintiff.

**Dr. Harrry Gill (Defendant 13)** was an employee of Defendant 2 who examined Plaintiff.

**Dr. Ray K. Chawla, MD (Defendant 12)**, was an employee of Defendant 2 and was involved in Plaintiff's treatment there.

**Dr. Harry Gill, MD (Defendant 13)** was an employee of Defendant 2 and was involved in Plaintiff's treatment there.

## CASE SUMMARY

1.      Plaintiff's wife and her associates attempted to murder him multiple times between July and October of 2013.

2.      On information and belief, her chosen method for murder was thallium poison which she had laced in his food, medicine, and had duped him into applying it to his recently broken left foot on the pretext that it would help his foot heal faster.

3.      Plaintiff fled to Defendant 1's facility twice in two days and asked for sanctuary and treatment.

4.      Both times Defendant 1 failed to properly diagnose and treat his physical ailments.

5.      He told Defendant 1 his wife was abusing him and poisoning him.

6.      Defendant 1 failed to test him for thallium, which doesn't show up on a standard toxicology screen, even though Plaintiff was showing symptoms consistent with thallium poisoning.

7.      Defendant 1 allowed Plaintiff's wife to bluff her way past Defendant 1's security protocol and proceeded to disclose to his wife he was a patient there and his condition, even after Plaintiff had told Defendant 1 under no circumstance was his wife to be told he was there.

8.      Defendant 1 involuntarily committed Plaintiff under false pretenses and shipped him to Defendant 2.

9.      Plaintiff told Defendant 2 his wife had poisoned him but like Defendant 1, they to failed to test him for thallium poison.

10.     Both Defendant 1 and 2 failed to report the attempted murder of one of their patients to law enforcement.

11.     Defendant 1 collected and preserved no evidence, then they willfully and maliciously ejected him from their facility without crutches or wheelchair when he could barely walk.

12.     Defendant 2 also collected and preserved no evidence of thallium poisoning nor did they treat his physical ailments.

13.     On information and belief, they did this solely because he was a man, and because he had a "history of mental health issues," and due to their gender bigotry and prejudices regarding the victims and perpetrators of spousal abuse and murder and their bias against men suffering from depression.

---

14.     Defendant 1 conspired and executed a plan to willfully and maliciously railroad Plaintiff into involuntary incarceration by fraudulently painting him a homicidal threat to others, as delusional, and as being unwilling to sign a voluntary committal form.

15.     Defendants recklessly endangered Plaintiff's life twice in the span of two days, then illegally and fraudulently incarcerated him for 12 days.

16.     They saw that Plaintiff was in pain, they asked him why he was limping, and he told them because his wife had poisoned him, and they laughed at him.

17.     Defendants willfully denied Plaintiff appropriate medical treatment for poison (such as the administration of an antidote), for the visible injury to his left foot (such as painkillers), for his limping, and deprived him of the most simple of accommodations to include reading glasses, crutches, and wheelchair.

18.     In July and August of 2016, both Defendants 1 and 2 once again involuntarily committed defendant because his wife lied to them claiming he was paranoid delusional about her.  As a result, Plaintiff was misdiagnosed again and was committed for a total of 19 days.

19.     For these illegal, willful, malicious, and reckless acts of commission and omission, Plaintiff seeks general, special, and punitive damages for Defendants' violation of his civil rights under the Americans With Disabilities Act, the Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution, HIPPA privacy rights, for twice recklessly endangering his life, for depraved indifference, for medical malpractice, for fraud, and for intentional infliction of emotional distress.

## JURISDICTION

20.     Proper jurisdiction is the US District Court of the District of Maryland as Plaintiff resides in Maryland and Defendants are located in Maryland, and because Plaintiff's constitutional

rights were violated in Maryland, and Defendants' violated several federal and Maryland laws in Maryland.

## PROCEDURAL MATTERS

None.

## FACTS

21.     At no time in Plaintiff's life has he suffered from serious or chronic mental health issues. The only mental health issues he has suffered from were two bouts of situational depression stemming from marital problems.

22.     He has never expressed intentions of suicide, homicide, or violence to anyone.

23.     Plaintiff's wife is a dressage horse trainer.  Her life's ambition is to compete for a gold medal in the Olympics in dressage.

24.     In 2002, Plaintiff's wife, who is both Australian and French, came to realize she would never achieve her Olympic dreams in Australia due to internal politics within Australia's dressage community.

25.     Because of this, she forced her then husband to pack up and move her, their infant daughter, and her dressage horses to Florida where she believed she had a better shot at making the US Olympic dressage team.

26.     Once in America, she soon realized that her husband did not make enough money to support her Olympic quest, and so she began looking for a sugar daddy who could afford to fully fund her Olympic run.

27.     Plaintiff and his wife met on-line and, once she found out he was a high-tech executive, she began aggressively pursuing him in Maryland.

28.     She divorced her then husband in January of 2010.

29.   In early 2010, Plaintiff and his soon-to-be wife founded a horse business called Dressage Quest LLC.  The company's business plan was to buy, train, and sell dressage horses and to give dressage lessons.  The company never made a profit, made close to zero in revenue, and thus Plaintiff was forced to cover all business expenses out of his own pocket.

30.   She and Plaintiff married in July of 2010 whereupon Plaintiff moved to Florida to be with his new wife and step-daughter.

31.   In 2011 they moved to Dayton, Maryland for Plaintiff's new job.

32.   His wife's insisted she had to have an Olympic sized indoor arena built for her on their property to train her horses year round in all-weather so she could make on to the US Olympics Dressage team.

33.   Plaintiff did not have the $125,000 it would have cost to build her the arena.

34.   So, his wife began trolling the Internet in search of a new sugar daddy.  He caught her via email and text messages that she was trying to entice wealthy men into sexual encounters.

35.   Plaintiff then caught his wife cheating on him with her horse farrier as well.

36.   At that time Plaintiff had taken out of $1,000,000 life insurance policy through his work.

37.   Plaintiff discovered from his wife's laptop search history that she had been researching ways on how to collect on his $1,000,000 life insurance policy in he even of his death.  He was not sick at the time.

38.   Plaintiff's wife and her associates attempted to murder Plaintiff multiple times between July and October of 2013.  Their chosen method for murder was thallium poison.

39.   In July of 2013, Plaintiff's wife tricked him into applying thallium poison dissolved in dimethyl sulfate oxide (DMSO) to his recently broken left foot, which had almost fully healed, claiming it would promote faster healing.

40.     Plaintiff began applying the mixture to his left foot twice a day until he developed a red scaly rash on his almost-healed foot and lower leg, and his foot and leg began deteriorating inexplicably such that he once again was in pain and was limping severely.

41.     He went to his orthopedist thinking he might have re-fracture his foot but his orthopedist said his x-ray showed his bones had almost completely healed and he was stumped as to why Plaintiff was experiencing increasingly severe pain and the red scaly rash.

42.     Plaintiff stopped applying the chemical to his foot.

43.     When Plaintiff's wife realized she had failed to kill Plaintiff with poison through his skin she laced his medicine with thallium.  Plaintiff had caught her rooting around his medicine drawer.

44.     Plaintiff began experiencing abdominal cramps and pain, constipation and profusive cold sweats.  He thought it might be his new anti-depressant medication, a medicine that came in capsules that could be pulled apart, so he stopped taking his medication, threw it out, hid all his pills, and his symptoms quickly subsided.

45.     On the night of October 4th of 2013, on information and belief, Plaintiff's wife realized the poison on his foot and in his medicine didn't work, so she and her mother proceeded to lace his dinner with thallium and a knockout drug.

46.     After he was knocked out and in bed, on information and belief, his wife slipped into the spare bedroom and applied more thallium/DMSO to both his feet, and smashed his left foot with a hard object to render him lame, defenseless, and poisoned.

47.     When Plaintiff awoke the next morning on October 5th of 2013, his left foot had a deep purple bruise where none had been before and he was in great pain and was limping severely.

48.     Plaintiff asked his wife to take him to the emergency room because he could barely walk and his foot was bruised.  Plaintiff's wife refused and left the room in disgust.

49.     At that moment Plaintiff was 100 percent convinced his wife was trying to murder him so he fled to Defendant 1's hospital facility in Annapolis.

50.     He told their staff his wife was poisoning him, had smashed his left foot, he showed them the purple bruising, and he asked for sanctuary and treatment.

21.     That day and the next, he told several of Defendant's medical staff including Maria Villanueva, MD, Kristen Norris, RN, Cynthia Radovic, RN, Kathleen Foster, LCPC, Michelle Goldfein, Kimberly Schauber, RN, Janet Wright, RN, Vladimir Demidov, MD, Cathryn S Wingate, LCPC, and Colleen Gibson, that his wife was trying to poison him.

57.     Plaintiff was also interviewed by Defendant 1's female family social worker about what was going on with his wife. Plaintiff explained how he was being mistreated and abused by his wife, and he told her that his wife and her cohorts were trying to murder him.

58.     The social worker took no notes, recorded nothing he told her, left the room, and did nothing further on his behalf. He never heard from her again.

51.     He asked Defendant 1 to test him for poison.

52.     Defendant 1 failed to run any specific tests to rule out thallium poisoning. They only ran a standard toxicology screen, which doesn't detect thallium.

53.     He asked them to call the police but they refused.

54.     He asked them to allow him to call the police but they refused.

55.     They failed to notify the police that one of their patients was reporting his wife had assaulted him and was attempting to murder him.

56.     Instead of testing for poison and calling the police, Defendant 1's Dr. Maria Villanueva called his psychiatrist Dr. Carl Segal, claimed Plaintiff was delusional, passed the buck to him, and dismissed Plaintiffs claims of spousal abuse and attempted murder.

---

57.     Plaintiff told the hospital staff under no circumstances were they to disclose his whereabouts to his wife, because she was trying to kill him.

58.     They proceeded to disclose to her his whereabouts and condition.

59.     His wife sweet-talked her way through the Defendant 1's patient security/privacy protocols by posing as a loving, caring wife, by crying, by showing the nurse their wedding picture.

60.     Then, on information and belief, his wife proceeded to defame him to the nurse and accused him of spousal abuse and falsely claimed he was mentally ill and a threat to her and her boyfriend.

61.     His wife did not possess Plaintiff's hospital security code, yet Defendant spoke with her anyway.

62.     The next morning Defendant ejected Plaintiff from the hospital over his strenuous objections.

63.     They forced him to limp out of their hospital carrying a heavy backpack with no crutches, no wheel chair, in severe pain, with no pain killers, no diagnosis, no treatment, and threw him back out on the street alone, thereby aiding and abetting his wife's next attempts on his life.

64.     After being ejected from the Defendant 1's facility, Plaintiff called his lawyer who told him to go to the Howard County Police, which he did.

65.     He told the police officer at the Howard County Police Headquarters that his wife was poisoning him and engaging in other illegal activity on his property.

66.     The officer did not believe him and shooed him away.

67.     On the evening of October 6th of 2013, his wife's team, on information and belief, tracked his location by cellphone/GPS and chased him through west Clarksville down Ten Oaks Road.

68.     He was able to escape by pulling off on Adams Way where he turned off his engine and lights.

69.     On the phone his wife screamed at him to tell her where he was and she told him they were coming for him with engines roaring and asked him if he could hear a speeding car.

70.     He heard them approaching in the distance so he hung up.

71.     He then saw two white high performance cars flash by on Ten Oaks road followed by a Howard County Police cruiser with lights flashing.

72.     Officer Matthew Kurtz (badge number 5733) of the Howard County Police pulled them over for speeding near the roundabout on Ten Oaks Roads at the intersection with Brighton Dam Road.

73.     Plaintiff fled to the Annapolis Sheraton hotel and booked a room.

74.     Unfortunately, on information and belief, they tracked him there and booked rooms on his floor.

75.     On information and belief, they proceeded to hack his laptop, broke into his room while he slept, scratched his legs, lathered them with a thallium/DMSO mixture, left the room and waited for him to die.

76.     Early in the morning on October 7th of 2013, Plaintiff woke up due to his body's reaction to the poison and found they had left a twisted-up paper towel they had stuck into the inside peep hole of his door and he found it lying on the floor.  He tried to reach his attorney but his WiFi and cellphone were jammed.

77.     He panicked and ran out of his room and headed for the stairwell(s).  However, both stairwell doors had been locked, so he ran to the elevator.

78.     At the end of the hall he heard his wife exclaim from behind the last door in the hall: "He's coming back."  He took the elevator to the lobby.

79.     In the lobby, the elevator doors opened and his wife and another white female walked rapidly out of the elevator toward him, until he shouted his wife's name, whereupon she spun around and ran back into the elevator.

80.     Plaintiff stayed in the lobby and demanded the desk clerk call the Anne Arundel County Police. Two officers arrived.

81.     They listened to his story and took him to Defendant 1's facility.

82.     On October 7th of 2013, Defendant's Dr. Vladimir Demidov and Colleen Gibson signed an involuntary psychiatric committal order for Plaintiff where they made six fraudulent representations by falsely asserting that:

       1) Plaintiff had a mental disorder

       2) He needed inpatient care or treatment

       3) He was unable or unwilling to sign a voluntary committal form

       4) He was a danger and a homicidal threat to others

       5) He was unable to care for himself in the community

       6) There was no available, less restrictive form of intervention that was consistent with the safety of the individual

83.     Plaintiff told Defendant 1's female staff member who presented him with a voluntary committal form that he intended to sign it and asked for reading glasses so he could read the form.

84.     She refused, ripped the voluntary committal form out of his hand, declared since he wouldn't sign it they were involuntarily committing him, and walked out of the room.

85.     Defendant 1's Dr. Demidov fraudulently claimed in his notes that "Patient is not reliability agreeable to voluntary treatment and therefore patient meets the criteria for certification."

86.     Dr. Demidov never directly examined Plaintiff.

87.     Plaintiff told Defendant 1's nurses and doctors his wife had poisoned his feet with DMSO and that she and her team had just tried to murder him in his hotel room.

88.     They noticed numerous scratches all over his legs and the red scaly rash on his left foot.

89.     He told them he hadn't scratched himself and that it must have been his wife that did it to him.

90.     He showed them the purple bruising on his left foot, told them he was in great pain (8 out of 10 on the pain scale), and demanded they test him for poison, because his urine sample was a greenish-brown color.

91.     They did not believe him, and refused to test him for poison other than a standard toxicology screen.  He pointed out his urine sample was greenish-brown but they didn't listen to him.

92.     The hospital staff refused to report spousal abuse and attempted murder of one of their patients to law enforcement, and they refused to allow him to call the police.

93.     Plaintiff was transferred by Defendant 1 to Howard County General Hospital (Defendant 2) in Columbia where for the next 10 days he underwent withdrawal from the poison in his bloodstream, and he experienced the shakes, twitching, muscle spasms, cramps, cold sweats. While there, the poison continued to wreak havoc on his left foot, and it also began appearing on his right foot (pain and red scaly rash) to the extent that he could barely walk around the ward without extreme pain and had to walk on his heels to move around.

94.     Defendant 2's staff asked him several times why he was limping around the ward and he explained to them it was because his wife had poisoned his feet.

95.     Plaintiff overhead a nurse joking about how Plaintiff had claimed his wife was poisoning him through his feet.

96.     Upon discharge, all Plaintiff's mental health care workers and his wife had convinced him he had been delusional and he came to believe he had hallucinated everything, and all his horrifying memories were repressed, and he entered a state of complete denial and dissasociative amnesia about his wife's attempts to murder him and his mistreatment at the hands of Defendents. He remained in that state for the next four years while enduring his wife's daily psychological abuse and gaslighting.

97.     In May of 2016, Plaintiff began suffering from gastrointestinal cramps and rectal bleeding and he went to Defendant 2 for treatment.

98.     Defendant 2 did not test him for poison and diagnosed him with general inflamation in his colon, and discharged him with an instruction to take an over the counter laxative and put him on an antibiotic.

99.     In August of 2016, Plaintiff finally realized he could no longer tolerate the his wife's constant gaslighting and abuse and at the urging of his family, he left the family home.

100.    In August of 2016, Plaintiff was involuntarily committed by Defendant 2's Michael R. Midgley, LCSW, and he was sent to Sheppard Pratt Psychiatric hospital where he remained an involuntarily committed inpatient for 12 days.

101.    Plaintiff had told Defendant 2's Michael R Midgley, LCSW that under no circumstances were they to speak with his wife about him.

102.    Michael R Midgley, LCSW then proceeded to violate Plaintiff's HIPPA privacy rights and called his wife and spoke to her about Plaintiff.

103.    On information and belief, his wife fraudulantly told Defendant 2's psychiatrist that Plaintiff was paranoid delusional and a threat to her.

104.   On information and belief, Defendant 2's psychiatrist based his decision to involuntarily commit him on his illegal discussion with his wife.

105.   While Plaintiff was committed, he was fired by his employer because had not returned to work. His annual salary was $125,000.

106.   Later that month, the same Defendant 2 psychiatrist threatened to involuntarily commit him again unless he agreed to voluntarily commit himself.

107.   Plaintiff had no choice so he signed the voluntary committal form, and thereafter he was transported to Laurel Regional Hospital where he spent 5 days before being discharged.

108.   Also in August of 2016, Plaintiff was brought to Defendant 1 in Annapolis and they told him they were going to commit him unless he agreed to voluntarily commit himself.

109.   Plaintiff once again felt he had no choice so he signed the voluntary commital form whereupon he was transferred to Bon Secours hospital where he spent the next 4 days before being discharged.

110.   Over the next seven months, once Plaintiff had left his wife and was no longer under his wife's psychological control and gaslighting, he began recovering from his post traumatic stress and dissasociative amnesia.

111.   In March of 2017, Plaintiff had recovered his faculties, memories, and critical thinking capacity and he began a process of going back into his records relating to the traumatic events he had experienced in 2013.

112.   For the first time he rediscovered evidence he had uncovered in 2013 relating to his wife's murderous campaign, his feelings of terror, the memory of said evidence's existance and feelings having been repressed.

113.    Once Plaintiff reviewed all the evidence he had from 2013 as well as after having collected all the medical and police records relating to those events, all of his repressed memories flooded back, he came out of his state of denial, and he realized he had been kept in a state of denial and in a compromised mental state for four years.

114.    All the medical and police records confirm that his recollection of the events of 2013 is fully accurate.

115.    In March 10th of 2017, Plaintiff filed for absolute divorce on the grounds of adultery and cruel and harsh treatment.

116.    Plaintiff lost his house to foreclosure in 2017 because of the loss of his job left him unable to keep up with the mortgage payments and because the foreclosure failed to serve him process on any of the foreclosure paperwork.

117.    Because of the loss of his security clearance, he has been unable to land a job in his field in the Maryland region as most of the IT/Cyber-Security jobs require a clearance in this area.

118.    Because of the loss of his job at Tenable Network Security in March of 2015, he was forced exercise his 270,000 stock options to avoid losing them.

119.    In order to exercise those options, he was forced to borrow from a lender that required a large pay back (The Employee Stock Option Fund), and he was forced to sell 170,000 shares back to Tenable to cover the tax liability and to pay back the lender.

120.    In October of 2015, Tenable raised $250M in a private equity event which caused Plaintiff to get hit with a large tax liability on the stock options he was forced to exercise or risk losing them.

121.    Tenable is preparing for an initial public offering for as early as the fall of 2018. On information and belief, the share price at IPO will be an estimated $20 per share. This places the

---

losses Plaintiff will suffer from the 170,000 employee stock options he was forced to exercise and sell to be in the neighborhood of $3,514,000.

122.    Because of his misdiagnosis by Defendant's 1 and 2 that he was suffering from paranoid delusions and psychosis and that he was a danger to himself and others, it established a false narrative regarding Plaintiff's mental health history that has haunted him ever since.

123.    This false mental health history narrative originally established by Defendants in 2013 and again in 2016, was later used as a pretex by the Howard County Police, the State of Maryland, a State forensic psychologist, and a judge in Howard County Circuit and District Courts, to arrest him, incarcerate him, and to declare him mentally incompetent and a danger to himself and others, and to prosecute him for crimes he didn't commit.

124.    This resulted in his being incarcerated for 3 months in the Howard County jail and 3 months in a State mental institution (Springfiled Psychiatric Hospital) in May through December of 2017.

125.    While in the jail and a mental hospital, Fifth Third Bank, which held the mortgage on his house, seized his house in foreclosure and sold it at auction.

126.    At the time, Plaintiff's home's estimated fair market value was $1,100,000.

127.    Because of Defendants' misdiagnosis of him which established a false mental health history narrative for Plaintiff, he has a public record of being declared mentally incompetent and a danger to himself and others, a public case record of being charged with felony first degree assault, felony burglary, breaking and entering, and false imprisonment, charges for which he was found not guilty.

128.    Because of Defendants' misdiagnosis, Plaintiff was falsely arrested for tresspassing on at the State's Attorney's office in Ellicott City, Maryland, and he now carries on his public record a

conviction of guilty and probation before judgment for tresspassing at a government office during business hours, a crime for which he was innocent.

## COUNT 1

## DENIAL OF MEDICAL TREATMENT ON THE BASIS OF SEX

## AND MENTAL DISABILITY

(In Violation of the Americans With Disabilities Act

The Fifth and Fourteenth Amendments' Due Process and Equal Protection Clauses, and

the Civil Rights Act)

Paragraphs 1 through 128 are incorporated herein in their entirety.

129.    Defendants illegally discriminated against Plaintiff due to his sex and mental disability in their refusal to treat his medical emergency and any of his other ailments, due to their gender bigotry regarding the victims and perpetrators of spousal abuse and murder, and their prejudice regarding patients having a "history of mental illness."

130.    Had Plaintiff been a woman or had he had no mental health history,  Defendant would have believed with certainty she was telling the truth, or at least, would have given her the benefit of the doubt, and they would have believed there was real physical, emotional, and psychological abuse and attempted murder occurring against said woman.

131.    Had Plaintiff been a woman or had he had no mental health history (depression), they would have with certainty provided her appropriate medical, psychological, logistical and legal assistance, they would tested her for poison, they would have given her an antidote for the poison, they would have reported the incident to the police, they would have preserved the forensic

evidence, they would have taken a picture of her bruised foot and red rash on it, and they would have provided her sanctuary and protection from further attack.

132.    Had Plaintiff been a woman or had he had no mental health history, Defendant's medical and security staff would have with certainty provided appropriate medical and psychological treatment, walking aids, and other logistical support as would have been appropriate to anyone in the same circumstances.

133.    It is highly likely Defendant's staff actually believed the exact opposite of the truth: That his wife, even if she were in fact trying to kill Plaintiff, must have had a good reason, and that Plaintiff must certainly deserve it because they had already pre-judged him a mentally ill spousal abuser.

134.    On information and belief, Defendant's staff conspired together and hatched a plan that would quickly result in Plaintiff's immediate involuntary committal to a psychiatric facility, where he would no longer be a danger, in their minds, to his wife and her lover.

135.    On October 7th of 2013, AAMC's Dr. Vladimir Demidov (Defendant 4) and Colleen Gibson (Defendant 7) signed an involuntary psychiatric committal order for Plaintiff where they willfully made multiple fraudulent representations, asserting that:

   a) He had a mental disorder

   b) He needed inpatient care or treatment

   c) He was unable or unwilling to sign a voluntary committal form

   d) He was a homicidal threat to others

   e) He was unable to care for myself in the community

   f) There was no available, less restrictive form of intervention that was consistent with the safety of the individual

---

136.     Regarding a) above, Plaintiff didn't have a mental disorder other than depression.  He was in a high state of agitation and terror because he was suffering from the effects of thallium poisoning, and because his wife and her team had just chased him and cornered him in his hotel room and tried to murder him.  Demidov and Gibson had obviously decided based on his gender and their illegal communications with his wife that he was a mentally ill wife abuser, that his wife could not possibly be trying to murder him since she had come to the hospital and put on her "sympathetic wife" act for them, so they abused their powers and willfully conspired and executed a plan to illegally incarcerate him under false pretenses.

137.     Regarding b) above, he didn't need to be an inpatient, he needed police protection and sanctuary, he needed an antidote for the poison, he needed painkillers and treatment for his feet, and he needed a safe place to stay to recover from his wife's multiple assaults and attempts to murder him.

138.     Regarding c) above, he told the AAMC female staff member who presented him with the voluntary committal form that he intended to sign it, but that he couldn't read it because he had left his reading glasses in the hotel, and he asked her to provide him reading glasses.

139.     She refused, ripped the voluntary committal form out of his hand, declared since he wouldn't sign it they were involuntarily committing him, and walked out of the room in triumph. It is noted there is no mention of this encounter in the hospital record so it is clear they covered it up since it didn't fit their false narrative.

140.     It is also noted that Dr. Demidov outright lied in his notes claiming "Patient is not reliability agreeable to voluntary treatment and therefore patient meets the criteria for certification."  It is finally noted that Dr. Demidov never directly examined Plaintiff.

141.    Regarding d) above, the only intentions Plaintiff had ever expressed, and the only actions he had thus far taken, regarding his wife and her lover, were to flee for his life from them, because obviously, he was physically compromised and was unable to stand and defend myself from assault, let alone initiate an assault against him.  He had demonstrated his intentions:  Flight, not Fight.

142.    Defendant 1's representation that he presented a homicidal danger to others or self was a willful lie and nothing more than a trumped up excuse for involuntary committal and an abuse of power.

143.    It is noted that Dr. Demidov outright lied a second time in his notes claiming Plaintiff was a "Homicidal Threat" which contradicts the nurses' notes that said he had no intention of assaulting his wife's lover.

144.    Regarding e) above, Plaintiff was fully capable of taking care of himself in the community, other than, of course, that he couldn't defend him from murder if out alone in the community, and that he needed treatment for poisoning and the smashing of his left foot.

145.    Regarding f) above, for the same reasons as a) through e) above, this representation is a willful lie.  What Plaintiff needed was treatment for poisoning and his smashed left foot, and a safe place to detox from the poison and heal, which was exactly what he demanded and which was exactly what they refused to provide him, because he is "a man with a history of mental illness."

146.    For these reasons, Plaintiff prays the Court find Defendant guilty of illegal discrimination and denial of medical treatment on the basis of sex and mental disability, in violation of the Americans With Disabilities Act, the Civil Rights Act, and the Fifth and Fourteenth Amendments due process and equal protection clause, and grant to Plaintiff financial damages.

## COUNT 2

### RECKLESS ENDANGERMENT

Paragraphs 1 through 146 are incorporated here in their entirety.

147.    Defendant is guilty of reckless endangerment of Plaintiff's health and life by willfully

and maliciously disclosing Plaintiff's whereabouts and physical condition, against Plaintiff's

vehement objections, to the very people who were actively trying to murder him. By doing so,

Defendant placed Plaintiff in dire peril by giving his murderers the vital intelligence they needed

to track him down and murder him.

148.    Defendant is guilty of even more outrageous reckless endangerment of Plaintiff in their

abject failure to provide him sanctuary and protection from those attempting to murder him.

Instead, they ejected him from their medical facility lame, poisoned, and without any protection,

no wheelchair, no crutches, which left him not only defenseless to any attack, but literally

poisoned with chemicals that were already coursing through his bloodstream that, if not treated,

would kill him.

149.    They did this even in the face of the physical evidence of domestic violence on his foot,

of his severe limp and in pain (8 out of 10 on the pain scale) for which there was no logical

explanation (other than Plaintiff's own) given his x-rays were negative, and even in the face of

Plaintifsf's cogent description of what his wife had claimed was being applied to his foot

(DMSO/poison), and also his description of what she was planning to do to his foot (smash it

with a bat or axe) to make him defenseless to lethal attack from her lover.

150.    It is clear that not of single one of Defendants' medical staff even made the most trivial

effort to look up cases and symptoms involving wives poisoning their husbands. Had they done

a 10-second Google search they would have found several famous cases of wives poisoning their husbands, and vice versa, with various types of poison such as thallium or rat poison.

151.    Defendant is guilty of reckless endangerment by not acting to prevent his death from poisoning.  They failed to run a simple blood and urine test to prove or rule out traces of poisons like thallium in his bloodstream, even in the face of the physical evidence including the bruising, and pain on Plaintiff's foot, the scratches all over his legs, and Plaintiff's detailed and cogent explanation of the murderous campaign his wife was waging against him.

152.    It is clear based on the evidence that Plaintiff wasn't crazy:  His story sounded crazy.  It appears Defendants' staff were unable to discern the difference between a crazy man and a sane man with a crazy story.

153.    Finally, Defendant is guilty of reckless endangerment of Plaintiff by failing to report the domestic violence and attempted murder of Plaintiff by his wife and her cronies to the police, by actively and willfully denying Plaintiff a phone to call the police, and by refusing to call the police after Plaintiff insisted they do so.

154.    In committing these illegal and callous acts of commission and omission, they ensured Plaintiff would never receive any police protection from his murderers, and it allowed Plaintiff's murderers free reign to execute Plaintiff with impunity once he was released onto the street.

155.    For these reasons, Plaintiff prays the Court find Defendants guilty of reckless endangerment and order the award to Plaintiff financial damages.

## COUNT 3

## CRIMINAL NEGLIGENCE

Paragraphs 1 through 155 are incorporated here in their entirety.

156.   Defendants' personnel are guilty of criminal negligence by willfully and maliciously failing to exercise a duty of care to Plaintiff that would have been routinely provided to any patient in a similar situation, because of their gender bigotry regarding men in a domestic violence situation, and because of their prejudice against those suffering from depression.

157.   Defendants' staff were criminally negligent in refusing to run a blood and urine test for poison on Plaintiff even after Plaintiff told Defendants staff his wife and her lover were trying to poison him.

158.   Plaintiff described in detail to Defendant's staff that his wife had provided him with a chemical that she identified as DMSO and that she had badgered him over and over that Plaintiff must put it on his foot.  Plaintiff told Defendant's staff that he believed his wife was attempting to poison him through his feet and legs using DMSO.  Plaintiff also explained to Defendant's staff that his wife was spiking his food and medications with poison.  Plaintiff explained to Defendant's staff the pain and other symptoms he had been experiencing in his foot since the application of the supposed DMSO, including the return of increasingly severe pain and his inability to walk without a severe limp.

159.   Defendants ignored everything Plaintiff told them and failed to take appropriate action to protect Plaintiff from physical harm.  They refused to take him seriously and refused to report the incident to the police, and they even refused to allow Plaintiff to call the police on his own behalf, even though they could clearly see the bruising on his left foot, and even though they could clearly see on the x-ray that Plaintiff's foot bones was fully healed and therefore should

not have been causing Plaintiff any pain or limp. Defendant's staff offered Plaintiff no explanation or treatment for the bruising, and the pain Plaintiff was experiencing with his feet.

160.    Defendants dismissed literally everything the Plaintiff told them, and everything they could clearly see. They did literally nothing about it. They ignored the physical medical evidence. Then, they abused their power to unlawfully incarcerate Plaintiff under fraudulent pretenses, including on a trumped-up diagnosis of psychosis and paranoid delusions.

161.    Defendant's is guilty of criminal negligence when they abused their power by deliberately, willfully, and maliciously denied Plaintiff his right to reasonable accommodation of Plaintiff's near sightedness in their failure to provide Plaintiff simple reading glasses even after Plaintiff told Defendant's female nurse that he could not read the form without them. Defendant's staff used Plaintiff's request for glasses as laughable pretext for involuntary committing him, which denied Plaintiff his liberty for 12 days.

162.    Defendant's also acknowledged to Plaintiff that they noticed scratches all over Plaintiff's body, upon which Plaintiff told them he had not done it to himself, and that he believed his wife had scratched him in his hotel room in order to speed up the absorption of poison into his bloodstream in order to kill him.

163.    Defendant's medical and security staff were guilty of criminal negligence when they violated their own policies and procedures by failing to supply Plaintiff with trivial medical accommodations including a wheelchair or crutches, by making him walk out on his own two feet with a severe limp without a definitive diagnosis, without any evidence the antibiotic was having any therapeutic effect on his symptoms, without an alternate treatment plan, and by forcing Plaintiff to search on foot for his car while in pain and with a severe limp.

164.    Finally, Defendants is guilty of criminal negligence when they willfully and maliciously

refused to report the threat of, or actual commission of, spousal physical abuse, including

attempted murder, against one of their patients.

165.    For these reasons, the Plaintiff prays the Court find Defendants guilty of criminal

negligence and order the award to Plaintiff compensatory and punitive damages.


## COUNT 4

### DEPRAVED INDIFFERENCE

Paragraphs 1 through 165 are incorporated here in their entirety.

166.    Defendant is guilty of depraved indifference to Plaintiff's, pain, suffering, and terror, by

willfully and with malice denying Plaintiff the most basic medical, psychological, and logistical

care that a medical facility owes to any patient in such a condition, male or female, mentally

healthy or ill.  They failed in their duty to provide pain killers, crutches, a wheelchair, a shoulder

to lean on, psychological counseling, any legal assistance, police protection, compassion, empathy,

or any treatment for his feet for the bruising and pain.

167.    Defendant 1 was guilty of depraved indifference when they ejected Plaintiff out of their

medical facility in the face of Plaintiff's pain and suffering and fear, because they believed he was

"faking it," when the medical evidence proved the opposite.  Defendants' personnel willfully and

maliciously demonstrated contempt and depraved indifference to Plaintiff's pain and suffering,

said pain and suffering which was intuitively obvious to anyone with eyes, ears, and a scintilla of

human compassion and decency.

168.    For these reasons Plaintiff prays the Court find Defendant guilty of depraved indifference

and award Plaintiff financial damages.

## COUNT 5:

### ILLEGAL INCARCERATION

Paragraphs 1 through 168 are incorporated here in their entirety.

169.    Defendant is guilty of illegally incarcerating Plaintiff when they abused the powers granted to them under Maryland law and illegally and willfully conspired to incarcerate him under false pretenses.

170.    Defendant further illegally incarcerated Plaintiff in their reckless denial of even the possibility that Plaintiff was telling the truth, and by failing to perform a single test to prove or rule out thallium poisoning, nor did they report it to the police, nor did they collect and retain any relevant physical evidence, or take any pictures.

171.    Defendant's deliberate and willful actions resulted in the denial of Plaintiff's liberty for 2 days at Defendant's facility, and then 10 more days at Howard County General Hospital in October of 2013.

172.    Under Maryland law governing involuntary commitment to a psychiatric facility, a patient must meet several criteria including:

    a. Be deemed be a danger to self/others;

    b. Be in need of treatment; and

    c. Be unable or unwilling to be voluntarily admitted

173.    In the case at hand, the Plaintiff did not meet criteria a. and c. above and Defendant involuntarily committed Defendant anyway because of their own gender bigotry and his mental health history (depression), and they stripped Plaintiff of his liberty in contravention of Maryland and federal law.

174.    Plaintiff had expressed to Defendant's medical staff that he was willing to sign the voluntary committal form if only he could read it, and that he couldn't read it because he didn't have his reading glasses with him. Defendant's female staff deliberately, willfully, and with malice refused to provide him reading glasses and then conspired with each other to perpetuate the fiction that Plaintiff was psychotic, so that they could prepare a false paper trail to minimize the risk they would sued by Plaintiff for illegal incarceration.

175.    It is clear from Plaintiff's horrible treatment at the hands of Defendants' staff that their legal and medical policies were specifically designed to minimize their financial risk and legal liability whenever they involuntarily commit a psychiatric patient, rather than being designed with the patient's best interests in mind. In doing so, Defendants put a system in place, which directs and demands that its staff skirt the law governing involuntary incarceration in order to eliminate their liability at the expense of their Patients' wellbeing. In doing so, Defendant is systematically, willfully, deliberately, and with malice, violating the law for financial and legal reasons.

176.    Second, Plaintiff was never a threat to himself or anyone else and yet Defendant's concocted and perpetuated a false narrative that he was a threat to others and used that as a pretext to involuntarily commit him.

177.    In their refusal to provide Plaintiff the simple accommodation of reading glasses, and in their trumped up diagnosis that Plaintiff was a threat to himself and others, and by involuntarily committing him under those false pretenses, it is beyond a shadow of a doubt that Defendant, willfully and with malice, illegally incarcerated Plaintiff and robbed him of his liberty in contravention of Maryland and federal law.

178.    For these reasons, Plaintiff prays the Court find the Defendant guilty of illegal incarceration and award to Plaintiff compensatory and punitive damages.

---

## COUNT 6:

### CRIMINAL VIOLATION OF PATIENT HIPPA PRIVACY RIGHTS

Paragraphs 1 through 178 are incorporated here in their entirety.

179.    Defendant is guilty of criminal violation of Plaintiff's HIPPA privacy rights in their willful and reckless disclosure of Plaintiff's whereabouts and condition, over Plaintiff's strenuous and repeated objections, to the very people who were actively trying to murder him, thus aiding and abetting his wife in her next attempts on his life.

180.    Defendant 1's own hospital records prove without further deliberation that Defendant sympathized with Plaintiff's wife at the expense of Plaintiff and disclosed to her his whereabouts and condition.

181.    Further, by concocting the false narrative that Plaintiff was homicidal towards Billy Romjue, they felt they were justified, based on their own false narrative, in contacting Plaintiff's wife and Billy Romjue and falsely asserting to them that Plaintiff wanted to murder Romjue, thereby once again revealing Plaintiff's whereabouts to his murderers.

182.    Defendant 2 violated Plaintiff's HIPPA privacy rights again in August of 2016 when they contacted his wife over his vehement objections and interviewed her and disclosed information to her.

183.    For these reasons, Plaintiff prays the Court find the Defendants in criminal violation of Plaintiff's HIPPA privacy rights and award to Plaintiff general and punitive damages

.

### COUNT 7:  MEDICAL MALPRACTICE

Paragraphs 1 through 183 are incorporated here in their entirety.

184.    Defendant are guilty of willful and malicious medical malpractice in their failure to act in even the slightest of ways to confirm or refute Defendant's assertion that he was being physical abused and poisoned by his wife.  Defendant failed to perform a blood or urine test to confirm or rule out thallium poisoning, and they failed to preserve any blood or urine samples or photographs for any potential criminal investigation.

185.    Defendants were guilty of willful and malicious medical practice by utterly failing in their duty to actually treat Plaintiff at all from the thallium poison coursing through his bloodstream.  Defendant put him in grave danger by failing to even attempt to discern whether Plaintiff had been poisoned and if yes, by what kind of poison, so they could give him the appropriate antidote or other appropriate treatment to prevent death by thallium poison.  They failed to collect the forensic evidence of any poison in Plaintiff's bloodstream or urine which would have been used by law enforcement to prevent Plaintiff's murder and to prosecute his wife and her co-conspirators.

186.    Further, Defendants were guilty of willful and malicious medical malpractice when they ignored the physical signs of potential poisoning on Plaintiff's feet and skin, the scratches all over his legs, the scaly red rash on his feet, the pain in his lower extremities, and they failed in their duty to rule out thallium poisoning as the cause of Plaintiff's physical signs of trauma and extreme agitation.

187.    Defendants were guilty of willful and malicious medical malpractice when they failed to notify the police as is required by law that they had a 53-year old male patient claiming spousal abuse and attempted murder, which could be corroborated by physical evidence, even though they could plainly see Plaintiff had bruising and scratches on his skin that could have been the result of attempted murder via poisoning and assault as was claimed by Plaintiff..

188. Defendant 1's family social worker was guilty of willful and malicious medical malpractice in her failure to follow up on anything Plaintiff had reported to her about mistreatment and attempted murder by his wife. She failed to follow up in any way with counseling or treatment for the psychological trauma Plaintiff was experiencing due to his wife's abuse. It appeared she considered her job to provide support to only women.

189. Defendant 1 is guilty of willful and malicious medical malpractice when they kicked Plaintiff out of the hospital against his wishes when he was in pain and when they hadn't even reached a definitive diagnosis and treatment plan for his foot, by failing to provide the most trivial of medical devices, crutches or a wheelchair, or a shoulder to lean on, even after having seen Plaintiff limp in pain both into and out of the ward, and by failing to test him for poison.

190. Further, Defendant 1 is guilty of willful and malicious medical malpractice when they failed to provide help finding his car, even as he was presenting with a severe limp. Plaintiff told the security guard posted at the exit door that his cell phone was dead and that he did not know where his car was parked. He was refused use of a cell phone, he was offered no crutches, no wheelchair, nor was he offered any assistance in calling his daughter or finding his car. Plaintiff was forced to limp around several levels of the hospital parking garage with a heavy backpack on his back, which caused severe pain and suffering.

191. Further, Defendant 1is guilty of willful and malicious medical malpractice due to their refusal to provide even the most trivial of accommodations, reading glasses, so he could read the voluntary committal form and other forms, which he would have voluntarily signed had he been able to simply read it.

192. Further, Defendant is guilty of willful and malicious medical malpractice when two of their doctors made multiple fraudulent representations on Plaintiff's involuntary committal form.

193.    Defendants were guilty of medical malpractice when they completely misdiagnosed

Plaintiff's medical and psychological condition during both visits to Defendant 1's facility on

October 6th and 8th of 2013; and in Defendant 2's facility thereafter, said misdiagnosis based

solely on their gender bigotry and their prejudices regarding the sex of spousal abuse perpetrators

and their bias against patients with a medical health history (depression in this case).

194.    Defendants are guilty of willful and malicious medical malpractice in their failure to

perform the most important duty of all for any medical institution; that is, to protect their patient

from being murdered on their watch.

195.    Finally, Defendant is guilty of medical malpractice in their failure to properly diagnose

and effectively treat Plaintiff's actual mental health issue: depression.  Defendant ignored

Plaintiff's assertions that the anti-depressant medication he was taking was completely

ineffective in treating his depression, and they changed none of his medications or dosage.  By

failing to do so, they condemned Plaintiff to four more years of depression which cost him his

job, lost past and future wages in base salary and bonuses, 177,000 shares of his stock holdings,

his house, his truck, his next job, and other financial damages.

196.    For these reasons stated above, the Plaintiff prays the Court find the Defendant guilty of

medical malpractice and award to Plaintiff general, special, and punitive damages.


### COUNT 8

### FRAUD

Paragraph's 1 through 196 are incorporated here in their entirety.

197.    Plaintiff's medical staff defrauded Plaintiff by leading him to believe that he would be

given time, and reading glasses, so that he could review the voluntary committal form and give

them his informed consent. Instead, when Plaintiff said he needed to read it first and needed

glasses Defendant's female nurse ripped the voluntary committal form out of his hands, and

flippantly and with condescension told him that since he wouldn't sign the form, they were

involuntarily committing him immediately. Defendant's nurse tricked him into thinking he had

time to carefully review the document, where, on information and belief, the nurse had planned

all along to rip the document out of Plaintiff's hands before he could read it, let alone actually

sign it, and thereby she succeeded in executing Defendant 1's plan to railroad him into

involuntary incarceration, leaving him flabbergasted and confused, with no recourse.

198.    Plaintiff is guilty of fraud in their making fraudulent representations in their notes and in

their involuntary committal form in order to involuntarily commit him even though he was

willing to sign the voluntary committal form, and even though he had never expressed homicidal

intentions to any of Defendant's staff or others, which is documented in their records.

199.    Plaintiff is guilty of fraud by willfully doctoring Plaintiff's medical records to make him

appear psychotic and a danger to self and others when he was neither, in order to cover

themselves in the event Plaintiff were to sue them for illegal incarceration or malpractice.

200.    It is noted that nowhere in Defendant's medical records do any of Defendant's staff

indicate Plaintiff was:

  a.  Ranting

  b.  Raving

  c.  Foaming at the mouth

  d.  Yelling

  e.  Saying he intended to assault or murder someone

  f.  Out of control

g.  Incoherent

h.  Screaming

i.  Displaying signs of psychosis

j.  Any other symptom commonly associated with someone suffering psychosis

k.  Any history at all of psychosis or delusions

201.   Defendant's staff even interviewed Plaintiff's ex-wife, Laura Liccione, who told them Plaintiff had never been psychotic or delusional in the 25 years she had known him.  They ignored her too, and just continued to believe, against all evidence to the contrary and because of their prejudices, what they wanted to believe, and fraudulently committed Plaintiff against his will for 12 days.

202.   It appears that in Anne Arundel and Howard Counties, hospital staff have never heard of a woman poisoning her husband to death to collect on his life insurance policy.

203.   For these reasons, Plaintiff prays the Court find the Defendant guilty of fraud and award to Plaintiff general, special, and punitive damages.


## PRAYER FOR RELIEF

**WHEREFOR:**  Plaintiff prays for judgment and relief as follows:

A.  Order the award to Plaintiff $10,000,000 in general damages.

B.  Order the award to Plaintiff $8,403,336 in special damages.

C.  Order the award to Plaintiff $25,000,000 in punitive damages

D.  Order the award to Plaintiff interest in any pre- judgment or post-judgment on any financial damages to Plaintiff in the amount to be determined at trial.

E.  Attorney's fees and costs

F. Grant Plaintiff leave to amend this complaint.

G. Such other and further relief as this Court deems just and proper.

I do solemnly declare and affirm under the penalties of perjury that the contents of the foregoing Complaint are true and correct to the best of his knowledge, information, and belief.

John Liccione          Date 6/7/18

Respectfully submitted,

**John Liccione, <u>PRO SE</u>**
5824 Harness Court
Columbia, MD  21044